The evidence authorized the verdict that the policy of insurance had not been canceled, and this finding was determinative of all motions and contentions in the case.
 DECIDED DECEMBER 3, 1949.
This case was formerly before the Supreme Court in Mensinger
v. Standard Accident Ins. Co., 202 Ga. 258 (42 S.E.2d 628), to which reference may be made for a statement of the pleadings. Following the decision of the Supreme Court, and after a trial in which the sole question referred to the jury was whether or not the insurance policy in question had been canceled before an accident which resulted in several damage suits against the alleged insured, the jury returned a verdict finding that, "The insurance policy was not canceled," and the insurance company moved the court to enter judgment in its favor notwithstanding the verdict. The court overruled the motion and the plaintiff excepted pendente lite. Judgment was entered on the verdict, and the plaintiff made a motion for new trial on the general grounds only. The motion was overruled and the plaintiff excepted. The case was taken to the Supreme Court by bill of exceptions, being case No. 16498 in that court, StandardAccident Insurance Co. v. Fowler, and on February 17, 1949, the Supreme Court transferred the case to this court because of lack of jurisdiction in the Supreme Court.
The evidence upon the trial of the case was substantially as follows:
A. C. Latimer testified: "I am a member of the Atlanta Bar and engaged in the active practice of law. One of my clients is the Standard Accident Insurance Company, the plaintiff in this case. In July, 1946, my office was located in the Hurt Building and next door to the agent of the Standard Accident Insurance Company, Epsten-Stringer Company so that I could take information about losses. I had a call, to the best of my recollection about July 6th, from a boy named Buster Plemmons, who runs a used-car lot in Atlanta. He knew I represented an insurance company and he asked could I get a policy of insurance *Page 504 
for Mr. Fowler, who had just purchased a used car. I told him I represented the people next door to me . . so I went next door and got Larry Brown, an employee, and he sat at my desk and used my phone and took down from Mr. Plemmons, who was talking, took down the motor number, make and model, and such other information as was necessary to write up a liability insurance policy. Mr. Brown actually prepared a policy, after receiving that information, for Mr. Fowler. He prepared a liability insurance policy with the Standard Accident. In this particular instance I caused a policy to be issued. I had a conversation with the defendant Fowler after that. Mr. Fowler called me on the morning of the third or fourth day following his application for insurance, and stated to me that his brother knew someone who worked for another insurance company somewhere in Atlanta and that he had talked with a solicitor of that company, and he wanted to know if he would have to take the policy that was written by the Epsten-Stringer Company agency on the Standard Accident Insurance Company. I told him that, as a proposition of law, where a policy had been written that they could make him take the policy or pay a portion of the premium. He said he did not want the insurance, and I told him I thought that was a hell of a way to do business, but if he did not want it we were not going to ram it down his throat and make him take it, and I would call the whole thing off. I told him that it was my understanding that the policy was canceled and it was just the same as if it had not been written. I remember very vividly that I left about that time to go on a vacation, because we had a very sick child, and I was gone to the beach for some time, and I failed to tell the agency before I left, in the rush getting off, that I had agreed with Mr. Fowler that there would be no policy, it was canceled and that he would not be charged any premium. When I returned to the city I communicated that information. I did not have any conversation with Mr. Fowler at any time after I communicated the information about the cancellation of the policy to the other employees of the agency. The next time I talked to Mr. Fowler was when an accident had been reported to me under circumstances that I thought I had better look into. I made an investigation of the accident and talked to Mr. Fowler in connection with that accident. Mr. *Page 505 
Fowler came to my office at my request, and I told him I would have to get certain facts from him. About the 4th of August he had had an accident, and it had been just a few days after that that he had picked up the policy, and I was putting him on notice that I wanted a sworn statement from him as was required of any insured. In that conversation with Mr. Fowler after the occurrence of the accident that he had with an automobile driven by Mr. Valdes, Fowler told me he got the policy after the accident had happened. I asked him specific questions whether, when he went by the agent to get the policy, he told the agent he had had an accident, and he told me he did not tell them. He said he got the policy and reported the accident some hours later. Mr. Fowler came back to my office after that. I think it was the 7th of August that he dictated a long statement. Then some days after the 7th he came by my office, at which time he brought three defendants service copies of suits for damages by these other parties that he had run into. I called you [Mr. Branch] on the telephone at that time inasmuch as you were in the building there and I wanted to have you in the case at that stage, and you came down to my office while Mr. Fowler was still there. My recollection is that my secretary was out at lunch, and you sat at her desk and typed up this letter of August 16th, addressed to Mr. Fowler and signed Standard Accident Insurance Company by me. I delivered this letter to Mr. Fowler, and I also delivered him $25 in United States currency, and I gave him back the service copies of the three damage suits. . . Some days later a gentleman walked in my office that I did not know at that time. It turned out to be a Mr. Ward Matthews, a lawyer in this suit, and he placed on my desk an envelope which I opened and which was a letter from Mr. Ward Matthews as attorney for Mr. Fowler, also $25 in currency. He said, as Fowler's attorney, that he considered the policy to be in effect, that he was returning to me the $25 that Mr. Fowler had paid down on the insurance policy, that he expected us to defend the suits, et cetera, and I told Mr. Matthews that I could not accept the $25 in money and I was not accepting it, that if he left it there I was not going to force it on him. He walked out and left the money on my desk. . . I am not a licensed insurance agent and never have been. I have had a *Page 506 
check each month from the Standard Accident Insurance Company for about seven years. My pay is fixed and definite up to a point. If I have additional claims I can charge more. My retainer covers the claim work that arises out of accidents of policy-holders of this local agent, Epsten-Stringer Company. . . My authority, in so far as representing the Standard Accident Insurance Company, is in connection with the adjustment and settlement of claims. But it exceeds that. I draw drafts on them. . . Plemmons, in Fowler's presence, called on me in July, somewhere around the 6th of July, as I recall it. This policy was written and dated substantially concurrent with the original telephone conversation that I had with the automobile dealer. The policy is dated July 8th. My recollection is that it was two or three days after he ordered the policy — not after the policy was written up — that he told me that he did not want the insurance. . . I told Fowler that the policy was canceled, we would not let him take it if he did not want it, and the reason it was not done right then I left on my vacation and did not say anything about it to Larry Brown about the cancellation until I got back. . . I talked to him prior to the first of August. . . I am positive that I did tell him before this accident happened."
L. G. Brown testified: "I am employed by the Epsten-Stringer Insurance Company. During the summer, last summer, of 1946, Mr. A. C. Latimer put me in telephone communication with someone who was seeking issuance of insurance on a certain automobile. Later, at Mr. Latimer's direction, and following the conversation, I prepared and issued a policy of insurance by the Standard Accident Insurance Company to Mr. Dewell Walker Fowler. Mr. Fowler did not stop at the office at any time within the next few days to pick up that policy. Mr. Latimer went out of town on a vacation after I issued the policy. Mr. Latimer left town approximately two weeks, I believe, after the policy was issued. I had a conversation with Mr. Latimer as soon as he returned. At the time of that conversation with Mr. Latimer I had in my possession the policy that I had written up for Mr. Fowler. Following that talk with Mr. Latimer I stamped the policy for cancellation. That was done at the direction of Mr. Latimer. Relying upon the conversation that I had *Page 507 
with Mr. Latimer I stamped the policy for cancellation. After that time when the policy was stamped for cancellation I had a conversation with Mr. Fowler over the telephone. He later, following that conversation, stopped at our office. He picked up the policy of insurance. Before he arrived there the cancellation I had stamped on the policy was removed by ink eradicator. I did that myself. When Mr. Fowler came to the office I handed the policy to him and he paid me $25. He did not tell me at that time, either at the time I handed him the policy or in the conversation that I had with him prior to that time over the telephone, that he had had an automobile accident in the automobile mentioned in that insurance policy. Approximately two hours after he picked up the policy he did that. At the time I gave him the policy and took the $25 I did not know that he had had a collision with the automobile prior to that time. . . After I had this conversation with him [Latimer] I put this stamp `canceled' on the front of the policy, approximately one-fourth of the way down the front of the policy. I used a regular rubber cancellation stamp approximately one by one. I did not initial it. It was not necessary to initial it. Nobody signed anything below that rubber stamp or the word `canceled' on the policy. It is not necessary. . . This policy was stamped right across the inside of the face of the policy `Accident, automobile liability.' When you asked me a while ago where I stamped this I said on the face of the policy about a fourth of the way down. . . I am regularly employed by Epsten-Stringer Company. I spend all my time in the employ of that concern. They are the agents of the Standard Accident Insurance Company. I have authority to countersign any policies. We cancel policies for the Standard Accident Insurance Company on proper occasions. Sometimes I enter up the cancellation myself. When I enter cancellations I send them to the home office. The home office of the Standard Accident Insurance Company has never refused to cancel a policy when I stamped it for cancellation. . . When we cancel a policy they [the home office] get the original policy with the cancellation stamp on it. . . I stamped this policy canceled on the Monday, I believe, after Mr. Latimer had returned from his vacation. I went in his office due to the fact that we had been holding the policy on my desk, *Page 508 
waiting for Mr. Fowler to come by and pick it up and pay the premium. Mr. Fowler had not come by the office, and I asked Mr. Latimer what to do about it. He told me to go ahead and cancel the policy. At that time I did not know the circumstances of the conversation between Mr. Latimer and Mr. Fowler; therefore, I stamped the policy canceled."
Dewell Walker Fowler testified: "Several days after I ordered these policies I called up Mr. A. C. Latimer to talk about the policies. I told Mr. Latimer that my brother knew some young lady who worked at a different insurance company or agency, and that I thought that I could get the insurance cheaper. That's right. And I asked Mr. Latimer if I had to take these policies. Mr. Latimer told me that I was liable for the policies and could be made to pay for them. Latimer told me that the agent that wrote the policies could hold me for the premiums, but that it didn't do business that way, and that if I didn't want them, I didn't have to take the policies. And I said I didn't want them, and Latimer said `That's a hell of a way to do business, but you don't have to take the policies,' and that they are canceled and you don't owe them any bill for the policies. That was in — within three or four days after the first phone call on July 6th that Latimer and I agreed that the policies were canceled and that I didn't owe any premium. I had the accident on August 4th. When I picked up the policies I did not tell Brown anything at all about having had the accident two days before that time. I got the policies and left the office and some two or three hours after that called up this same Epsten-Stringer Company and reported the accident. Then it was on August 13th, which was about a week later, that these suits were filed against me by Mr. Valdes and Miss Rudolph and Mrs. Mensinger. It was after the suits were filed against me that I went to Mr. Latimer's office on August 16th, when he gave me the letter with the $25 attached to it. At that time I believe I stated that I had the copies of the suits in my possession and tried to turn them over to Mr. Latimer, but he refused to accept them and said that the company was denying liability on the policies. I left his office, taking the letter that was given to me, the $25 and the copies of the suits. At the time I had this accident I didn't think that I had any insurance, because I thought Mr. Latimer and I had agreed to *Page 509 
cancel the policies and that I would not have any bill for it. . . When I called up the insurance agent who had written this policy for me with the initials that I referred to a few minutes ago, `L. G. B.', I asked him, had the bill in my hand, I said `Is this insurance still good?' and he says `Well, who is it you [are?] for?' I said `Dewell Fowler, Dunwoody, Georgia.' He said `Yes.' I said `It has been canceled?' He said `No; you want it canceled?' I said `Not if it hasn't been canceled.' I said `I will be down and pick it up.' I had received a bill for the entire premium after I had made the request to Mr. Latimer that it be canceled and Mr. Latimer had told me that the agents could hold me liable for the premiums, but that they didn't do business that way. Then some twenty days later I got the bill, and after I got the bill I called and asked him if it had been canceled, and they told me it hadn't, and then I went and got it and then reported it. Mr. Latimer's secretary, I guess, when I read off the initials was L. G. B. She said that was Mr. Brown's or something like that. But the reason I went for the policy was because I called, after getting the bill, and they told me it had not been canceled, and asked me whether I wanted it canceled, and I told them `No,' if it hadn't been I would come and get it, and I went down and paid the $25 and picked up the policy. . . In that conversation that I had personally with Brown when I went down and picked the policy up I said `I want to pick up the policy.' `What's the name?' I said `Dewell Fowler, Dunwoody,' and he reached right over there in the rack and got it. They didn't have to take, with ink eradicator or otherwise, the word `canceled' off of the policy. They didn't take a thing off of it. They handed it to me promptly when I got there. He got an envelope and put the policy in the envelope and put it in my pocket and walked out."
All the motions raise the single question: Was the evidence sufficient to authorize the jury to find that the policy of insurance in question had not been canceled at the time of the accident involved in the case? *Page 510 
It seems to us that the jury were authorized to find from the evidence that A. C. Latimer was merely a claims adjuster of the insurance company, and not an agent to receive applications for policies of insurance or to receive premiums, or to write policies of insurance or to cancel them; that he was, under the facts of this case, merely an intermediary or conduit chosen by Fowler, the beneficiary under the insurance policy, and the insurance company, through whom the negotiations culminating in the writing of the policy in question would be carried on; that after the policy was issued to Fowler he sought a few days thereafter to make Latimer an intermediary or conduit through which the negotiations for the cancellation of the policy would flow, but that Latimer never conveyed the proposal of Fowler to have the policy canceled by mutual consent to the duly authorized agent of the company until after the accident which resulted in several claims for damages against the alleged insured, Fowler, and had not communicated this proposal from Fowler until after August 6, 1946, prior to which date the premiums had been demanded, were paid and accepted by the company. The jury were authorized to find further that the policy of insurance in question was issued on July 8, 1946, and that a few days thereafter Fowler made a proposal through the intermediary, A. C. Latimer, that the policy be canceled, as he thought he could obtain another policy which would be cheaper; and that the proposal seeking to cancel the policy by mutual consent, if the insurance company would not hold him liable for premiums, was not transmitted to an agent of the company authorized to relieve the beneficiary from the payment of premiums and to accept such proposal of its cancellation by mutual consent. Larry Brown, the agent of the insurance company who had written the policy, testified on this subject that when Latimer came back from his vacation in Florida he went to Latimer and told him that Fowler would not come by and pick up the policy and pay the premiums, and that Latimer told him to go ahead and cancel the policy, and Brown did not know at the time of the circumstances of the conversation of Latimer and Fowler relating to the question of mutual cancellation of the policy, thus, in effect, saying that Latimer, the intermediary did not convey to Brown, the agent of the company, the proposal of Fowler to cancel the policy by mutual *Page 511 
consent until after the demand for payment in the form of the bill had been received by Fowler and after the accident had occurred and after the premium had been paid in response to demand, although the accident had occurred between the time the bill was dated and the time the premium was paid in response to such demand of the company in such bill. We do not think that the evidence that Latimer told Fowler that the agent of the company could hold him for the premiums, but they would not do so, nevertheless "That was a hell of a way to do business," but that the policy was canceled, and that on the first of the month next thereafter the agent Brown sent a bill to Fowler demanding the payment of the premium (it not appearing that Latimer had any authority to bind the company in relieving Fowler of the payment of the premiums or in canceling the policy) would require the jury to infer that the insurance company was to be discharged from its obligation while Fowler remained liable for the premiums. Home Ins. Co. v. Chattahoochee Lumber Co.,126 Ga. 334 (55 S.E. 11). The jury were authorized to find that the policy was not canceled by reason of the mutual consent of both parties. The fact of additional evidence that Latimer, the intermediary, who had no authority to cancel the policy for the insurance company, told Fowler a few days after the policy had been issued (about July 11th) that the policy was canceled and that Fowler thought that the policy was in fact canceled would not change the situation, for the duly authorized agent of the company who had written the policy demanded payment thereafter by sending a bill to Fowler dated on the first of the following month, August 1, 1946, in response to which Fowler paid the amount of the bill on August 6, 1946, to the agent who had written the policy.
As to the payment of premiums, the jury were authorized to find that the company had sent a bill dated August 1, 1946, to Fowler after he had sought to have the policy canceled by mutual consent and be relieved of the payment of the premiums. On August 6, Fowler communicated with Brown to know if the policy had been canceled, whereupon Brown asked him if he wished to cancel it, and Fowler told him "Not if it had not been canceled." Brown told him that it had not been canceled and Fowler said he would be around and pick it up. Thereafter *Page 512 
Fowler on the same day went around and paid Brown the premium of $25, and Brown thereupon delivered him the policy. Brown testified that he had authority to cancel policies for the company, and that when he entered cancellations he sent them to the home office and it had never refused to cancel a policy when he had stamped it for cancellation. He testified that he had marked the policy for cancellation on August 6th, about two hours previous to that conversation with Fowler on the same day, and that he had later with ink eradicator erased such stamping. However, Fowler testified that when he paid down the $25 premium Brown took the policy out of the pigeonhole and delivered it to him, and that there was nothing on the policy to show a cancellation. Of course, the jury could have accepted Fowler's version of this happening. Thus we think that the jury were authorized to find on this feature of the case that the policy had not been canceled for non-payment of the premiums. The jury were authorized to find on the whole evidence that the policy had not been canceled and was of force and effect on August 4, 1946, at the time of the accident in question.
Judgment affirmed. Gardner and Townsend, JJ., concur.